*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DIANE NEWTON, Personal Representative of the
ESTATE OF PAUL NEWTON,

        Plaintiff-Appellant,

v

MCLAREN PORT HURON, DOROTHY DUDAS,
R.N., and KURT BRINKER, P.T.,

        Defendants-Appellees.

UNPUBLISHED
December 22, 2025
9:28 AM

No. 373235
St. Clair Circuit Court
LC No. 23-002367-NH

Before: K. F. KELLY, P.J., and BORRELLO and CAMERON, JJ.

PER CURIAM.

In this wrongful-death action, plaintiff, Diane Newton, as Personal Representative of the Estate of Paul Newton, appeals by right the order granting summary disposition in favor of defendants, McLaren Port Huron (McLaren), Dorothy Dudas, R.N., and Kurt Brinker, P.T. on the ground that defendants were immune from liability pursuant to the Pandemic Health Care Immunity Act (PHCIA), MCL 691.1471 *et seq.* For the reasons set forth in this opinion, we reverse and remand to the trial court for further proceedings.

## I. BACKGROUND

This case arises from an incident during the early months of the COVID-19 pandemic where the decedent, Paul Newton (Newton), fell and sustained injuries during the course of receiving medical treatment at McLaren. On April 14, 2020, Newton presented to McLaren for respiratory issues and shortness of breath. He had a medical history that included chronic obstructive pulmonary disease and pneumonia, and a chest x-ray revealed a "suggestion of multifocal pneumonia." Newton took an initial COVID-19 test, which returned a negative result. However, medical notes indicated that Newton "may still in fact have a coronavirus." Despite this, medical records did not indicate that he was treated for COVID-19 and summarized the reasons for Newton's visit as pulmonary edema and congestive heart failure.

Newton was placed on the intensive care unit (ICU) stepdown telemetry floor for cardiac monitoring. Upon his admission, Newton was assessed as a high fall risk, and defendants

-1-

implemented several fall-mitigation techniques, including the use of a call light and chair alarm in Newton's room.

The hospital was actively treating COVID-19 patients on Newton's floor, and the doors to patient rooms were kept shut in order to reduce the spread of COVID-19. On April 16, 2020, physical therapist Kurt Brinker conducted a physical-therapy evaluation with Newton at about 10:00 a.m. The evaluation took place inside of Newton's room because during that time, COVID-19 prevented Brinker from conducting treatment outside of patient rooms.

The same day, at about noon, nurse Dudas performed an assessment of Newton and gave him his medications before going on her lunch break. Dudas left Newton sitting in his bedside chair with a chair-alarm clip attached to his hospital gown. The chair alarm was designed to go off if Newton stood up from his chair. Dudas was not concerned that Newton would attempt to get out of his chair unassisted because Newton was aware that he needed to use a call light for nursing assistance, and Newton could reach the call light from his chair. At about 1:45 p.m., when Dudas returned from her break, she noticed that Newton's chair alarm was going off and she found him lying on the floor. Dudas attempted to call a rapid-response team for assistance and also called out into the hallway for help, but the only staff that responded were security officers and her manager. Dudas speculated that the failure to timely attend to Newton's chair alarm, and the lack of response to her requests for help, were a result of the COVID-19 pandemic. Newton passed away on April 24, 2020.

Plaintiff initiated this wrongful-death action against defendants, asserting claims for medical negligence against McLaren, Dudas, and Brinker. The complaint alleged that Newton suffered a foreseeable and preventable fall as a result of the negligent medical care provided by defendants, which in turn caused a significant head injury that ultimately caused Newton's death. Plaintiff further alleged that defendants left Newton unsupervised and failed to properly, timely, and continuously implement appropriate fall-mitigation strategies for a patient such as Newton who had been designated a high fall risk.

Defendants moved for summary disposition pursuant to MCR 2.116(C)(7) and (10), arguing that they were immune from liability under the PHCIA. The trial court granted defendants' motion. This appeal ensued.

## II. STANDARDS OF REVIEW

This Court reviews issues of law de novo, including the interpretation and application of a statute. *Whitman v Burton*, 493 Mich 303, 311; 831 NW2d 223 (2013). This Court also reviews a trial court's decision on a motion for summary disposition de novo. *Chisholm v State Police*, 347 Mich App 646, 651-652; 16 NW3d 563 (2023).

"A motion for summary disposition under MCR 2.116(C)(7) is warranted when immunity is granted by law." *Id*. at 652. On appellate review, this Court "consider[s] the documentary evidence submitted by the parties and accept[s] the contents of the complaint as true unless contradicted by documentation submitted by the nonmoving party." *Id*.

"A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the claim and is properly granted when there is no genuine issue of material fact and the moving

party is entitled to judgment as a matter of law." *Id.* "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds might disagree." *Id.* On review, this Court "consider[s] the documentary evidence in the light most favorable to the nonmovant." *Id.*

## III. ANALYSIS

Plaintiff argues that the trial court erred by granting summary disposition in favor of defendants on the basis of PHCIA immunity because there was no evidence of a sufficient connection between the medical services defendants provided to Newton and services provided by defendants in support of the state's response to the COVID-19 pandemic.

Section 5 of the Pandemic Health Care Immunity Act, MCL 691.1471 *et seq.*, provides as follows:

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility. [MCL 691.1475.]

This Court has held that the Legislature's "clearly-communicated intent" in this statute was to "limit this immunization to services stemming from the pandemic." *Skipper-Baines v Bd of Hosp Managers for Flint*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 365137); slip op at 3. This certainly does not mean that the Legislature intended to provide the statutorily described level of immunization for *all* medical services of whatever nature performed *during* the pandemic. *Id.* at ___; slip op at 3-4. For the immunity provided by MCL 691.1475 to apply, there must be a "connection" between the nature of the malpractice alleged and the COVID-19 pandemic. *Id.* at ___; slip op at 4. Accordingly, this Court explained its holding in *Skipper-Baines* as follows:

> We do not hold that immunity only applies when a patient is being treated for COVID-19, but it is clear that there *must be some connection*. For example, if an unrelated emergency was not timely dealt with because hospital staff were overwhelmed with COVID-19 patients, there might be immunity. If a hospital ran out of ventilators, there might be immunity for cases involving patients who needed ventilators for unrelated ailments. [*Id.* (emphasis added).]

Here, although Dudas in her deposition attempted to blame the failure to timely respond to the decedent's fall on the circumstances of the pandemic, her statements were nothing more than unsupported speculation that there could not have been any such failure unless it was caused by the pandemic. Moreover, the factual evidence that Dudas provided actually demonstrates a complete lack of connection between the nature of the malpractice alleged and the circumstances of the pandemic.

The alleged malpractice in this case involved leaving Newton unsupervised and failing to properly, timely, and continuously implement appropriate fall-mitigation strategies for a patient such as Newton who had been designated a high fall risk. These failures also apparently extend to a failure to timely and appropriately respond to a patient who had fallen after being designated as a high fall risk. Dudas testified that the standard general precautions for a high-fall-risk patient included "activating alarms, chair alarms, bed alarms, [and] answering the call light promptly." The decedent had a chair alarm that would sound an alert if he got out of his chair. Dudas testified that she believed that the chair alarm was going off when she found the decedent lying on the floor of his room and that she did not know how long the alarm had been going off. Dudas also testified that the chair alarm "may have been attached to the call light," in which case the alarm would also have been heard in the nurse's station. When Dudas went on her lunch break, she had asked other nurses to be aware of her patients. Dudas explained the lack of response to the decedent's chair alarm as follows:

> I think that people weren't able to answer it. I think that there was so much going on with the COVID, that there wasn't anybody that was available to answer it right away. So many people in rooms with the door closed doing things for people in isolation. Because I didn't get a response to my rapid response, you know, I just got the security guard, I didn't get anybody, the rapid response team, no -- I couldn't find any help so I --

> You know, then there were people on the unit so I think that was the case, I think that COVID patients made our staffing requirements low.

This is nothing more than an unsupported assertion that because nobody responded right away to the fall alarm, it somehow "must" have been a result of the concurrent COVID-19 pandemic. There is simply no record evidence of an actual connection between the decedent's fall and services related to providing COVID-19 treatment beyond such entirely speculative assertions.

Had there been *evidence* that the medical staff was actually so consumed with other COVID-related patient services that nobody was available to respond to the decedent's chair alarm, then the requisite connection could have potentially been established. *Skipper-Baines*, ___ Mich App at ___; slip op at 4. Here, Dudas actually testified that the number of patients that had been assigned to her on that day was within the typical normal range. Without any *evidence* that these patients, or other patients assigned to other staff, were somehow consuming more of the staffing resources than normal, there is no basis on which to conclude that there was any connection between COVID-19 and the injuries that led to the decedent's death in this case. There was also no evidence that defendants were somehow prevented from providing appropriate fall-mitigation strategies because of the pandemic.

Accordingly, the trial court erred by granting defendants' motion for summary disposition.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiff having prevailed may tax costs. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Thomas C. Cameron

-4-